998 So.2d 516 (2008)
Stephen SMITH, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-1903.
Supreme Court of Florida.
September 25, 2008.
As Revised on Denial of Rehearing December 18, 2008.
*519 Ryan Thomas Truskoski of Ryan Thomas Truskoski, P.A., Orlando, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, Candance M. Sabella, Assistant Attorney General, Bureau Chief, and Stephen D. Ake, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
Stephen Smith appeals from his judgment of conviction for the first-degree murder of a state correctional officer, Darla K. Lathrem, and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm.

I. THE FACTS AND PROCEDURAL HISTORY
Smith and his codefendants, Dwight Eaglin and Michael Jones, were indicted for the first-degree murder of Officer Lathram at Charlotte Correctional Institution (CCI) during an escape attempt.[1] The murder was charged under the alternative theories of premeditated murder and felony murder while engaged in escape or resisting an officer with violence. The defendants were tried separately.

*520 A. The Guilt Phase
During 2003, the defendants worked with a small group of other CCI prisoners on renovations to the inmate dormitories. This construction work included plumbing and welding and thus provided inmate work crews with access to a number of tools. Beginning in early 2003, Smith, who was serving multiple life sentences, and Jones began to formulate an escape plan. They planned to build a ladder and escape over the perimeter fence. When their first plan was thwarted, however, Smith and Jones developed a new plan with Eaglin.
Under the new plan, the inmates would join ladders from the tool room at CCI by drilling holes and adding bracing. The amalgamated ladder would rise sixteen feet above the ground and span across the tops of both perimeter fences, which were at least twenty feet apart. With the ladder-bridge in place, Eaglin would go over the first perimeter fence and, when the guard truck drove by, attack the driver with a hammer. Because they needed access to ladders and other necessary tools, the trio planned to escape during the ongoing dormitory renovation project.
Smith and the others decided to escape before construction was completed on the final dormitory. To further facilitate the plan, Smith volunteered for the inmate crew that sometimes worked at night, which already included Jones and Eaglin. At such times, five or six prisoners worked in the empty dormitory under the supervision of a single corrections officer. In talking to other inmates about the plan, Smith said that he would kill any correctional officer guarding them and that he would be famous on the news. Smith preferred to escape when a female officer was on duty so that he could rape herjust in case he was killed during the escape.
On June 11, 2003, with renovations soon to be completed, the defendants put their plan into action. At 4:00 p.m., Officer Lathram took five inmatesthe three defendants and two other inmatesto work in the dormitory for the evening. At 8:30 p.m., Lathram accounted for the five inmates, and about twenty minutes later, another officer personally picked up the count slip from Officer Lathram.
After the head count, Eaglin beat up one inmate and locked him in a cell; Eaglin then returned with a sledgehammer and beat him to death. Smith and Jones told Officer Lathrem they needed something from a locked mop closet. They all went to the closet, where the officer began to search for the correct key. Eaglin struck her twice in the head with the sledgehammer. They took the officer's radio and keys. While Eaglin struggled to put the officer's body into the closet and lock the door, Smith and Jones left to assemble the ladders for the escape. Before joining Smith and Jones, Eaglin found the other inmate and hit him in the head with another hammer. Injuring the inmate was part of the plan because that inmate did not want to escape and did not want to be disciplined for cooperating with the escape plan. The defendants carried two large ladder sections outside and put them together. When they attempted to lift the ladder, however, it collapsed and fell against the perimeter fence, setting off an alarm.
Correctional officers responding to the alarm saw the three defendants attempting to escape. Eaglin stood between the perimeter fences; Smith was climbing a ladder leaning against the inner fence, with Jones standing nearby. Upon seeing the guards, Smith and Jones ran into the dormitory, where they were quickly apprehended. The correctional officers also discovered a pool of blood outside a locked mop closet. Officer Lathrem lay dead in the closet, a sledgehammer on the floor *521 beside her. The responding officers also found the two other inmates, one with a head injury in one cell and the other dead in another cell.
The jury returned a verdict finding Smith guilty of first-degree murder.

B. The Penalty Phase
In the penalty phase, the State presented evidence about Smith's 1990 convictions for murder, armed robbery, and armed burglary with assault, in which Smith broke into a home, stole money, and beat to death the elderly woman he encountered there. The State also presented evidence of Smith's other 1990 convictions for armed sexual battery, armed burglary, armed robbery, and kidnapping. In that break-in, Smith stole a VCR and tapes and took a young girl outside the house where he forced her to perform oral sex on him. As a result of these crimes, Smith was sentenced to multiple life sentences, some consecutive to others. Finally, the State also introduced evidence that in 1981, Smith was convicted in Rhode Island for the armed sexual assault of his sister.[2]
Smith presented numerous witnesses, including family members and a former Rhode Island social worker, regarding his background and character.[3] They testified that Smith's father was frequently intoxicated, violent, and physically abusive. He also sexually abused Smith's sisters. Smith's father was a poor provider, and the family essentially lived on welfare. Smith's parents did not display affection, provide religious or moral guidance, or require school attendance. The State of Rhode Island removed Smith from his home because he could not be controlled at home. From ages eleven to eighteen, he was in state placements ranging from group homes to juvenile prisons, and twice underwent psychiatric evaluation. Smith regularly escaped from many of the placements and returned home, and he frequently violated the law. As a young man, Smith and his younger brother went to Florida where they used drugs heavily, and where Smith had a sexual relationship with his aunt.
Dr. Frederick Schaerf, an expert in forensic psychiatry, testified that Smith has a history of depression, mood disorder, attention deficit disorder, hyperactivity (as a child), and substance abuse. However, Smith's depression and substance abuse were in remission. Smith has a low normal IQ "in the 80 range," and the doctor concluded that he has an antisocial personality disorder.
Finally, Smith presented various witnesses to testify about the supervision and safety policies and procedures at CCI at the time of the murder.

C. The Trial Court's Order
By a vote of nine to three, the jury recommended a sentence of death. The trial court adopted the recommendation, finding the following aggravating factors: (1) the defendant was a convicted felon under a sentence of imprisonment; (2) he had prior violent felony convictions; (3) the murder was committed for the purpose of escape from custody, and the victim was a law enforcement officer engaged in official duties (merged); and (4) the murder *522 was cold, calculated, and premeditated (CCP). In mitigation, the court found (1) Smith's background (great weight); (2) Smith's expression of remorse (little weight); and (3) mental and emotional health issues, including a history of depression, attention deficit disorder, and substance abuse (some weight).[4] The court rejected as mitigating the "failure of officials at CCI to properly administer the prison and to properly supervise inmates." The trial court concluded "that the aggravating circumstances in this case greatly outweigh the mitigating circumstances present."

II. THE ISSUES ON APPEAL
In this appeal, Smith raises seventeen issues. For purposes of our analysis, we have grouped several of them together and address them below.

A. The Ineffective Assistance of Counsel
We begin by discussing a category of claims that we will not address. Smith raises five claims of ineffective assistance of counsel.[5] Under the two-pronged standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must point to specific acts or omissions of counsel that are "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment," id. at 687, 104 S.Ct. 2052, and establish prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id.
Claims of ineffective assistance of trial counsel are usually presented in a postconviction motion under Florida Rule of Criminal Procedure 3.850. Under that rule, the circuit court can be specifically presented with the claim, and apply the Strickland standard with reference to the full record and any evidence it may receive in an evidentiary hearing, including trial counsel's testimony. Thus, ineffective assistance claims are not usually presented to the judge at trial, and we have repeatedly stated such claims are not cognizable on direct appeal. E.g., Martinez v. State, 761 So.2d 1074, 1078 n. 2 (Fla.2000) ("With rare exception, ineffective assistance of counsel claims are not cognizable on direct appeal."); McKinney v. State, 579 So.2d 80, 82 (Fla.1991) ("Claims of ineffective assistance of counsel are generally not reviewable on direct appeal but are more properly raised in a motion for postconviction relief."); Kelley v. State, 486 So.2d 578, 585 (Fla.1986) (same); State v. Barber, 301 So.2d 7, 9 (Fla.1974) (holding that claims of ineffective assistance of counsel "cannot properly be raised for the first time on direct appeal" because the trial court has not previously ruled on the issue). We recognize that "[t]here are rare exceptions where appellate counsel may successfully raise the issue on direct appeal because the ineffectiveness is apparent on the face of the record and it would be a waste of judicial resources to *523 require the trial court to address the issue." Blanco v. State, 507 So.2d 1377, 1384 (Fla.1987); see also Gore v. State, 784 So.2d 418, 437-38 (Fla.2001) ("A claim of ineffective assistance of counsel may be raised on direct appeal only where the ineffectiveness is apparent on the face of the record."); Mansfield v. State, 758 So.2d 636, 642 (Fla.2000) (same). Thus, in the rare case, where both prongs of Stricklandthe error and the prejudiceare manifest in the record, an appellate court may address an ineffective assistance claim. Not one of Smith's five claims meets these criteria, however. We therefore decline to address these claims now. Smith is free to raise them in an appropriate postconviction motion.

B. The Motion to Suppress
Smith first argues that the trial court erred in denying his motion to suppress his statement and that the court's order lacked sufficient findings of fact and conclusions of law, making appellate review impossible. We disagree.
Over a month after the escape attempt and murder, Smith waived his Miranda[6] rights and was questioned by an agent of the Florida Department of Law Enforcement. In this his fourth statement, Smith was videotaped as he walked through the CCI dormitory with Agent Uebelacker, answering questions about the plan for and execution of the attempted escape.[7] Defense counsel filed a motion to suppress his statements, arguing they were involuntary because Smith lived in "inhumane circumstances" after his transfer to Florida State Prison. The motion alleged Smith was deprived of basic items, was threatened, was irregularly fed, and was deprived of sleep.
At the hearing, the trial court heard some live testimony and was presented with depositions and other evidence to review, such as the videotape of Smith's July 31 statement. Agent Uebelacker testified that in his several meetings with Smith over the course of almost three weeks, Smith never complained about his treatment and had no apparent injuries. On each occasion, he waived his rights and made a statement. During his June 23 trip to Florida State Prison, however, Uebelacker heard a surreptitious tape recording of Smith and his codefendants as they sat in holding cells before the interview and complained about their treatment there. Uebelacker requested that prison authorities look into the complaints, and they did. The testimony from corrections personnel was that Smith was not threatened or otherwise mistreated. Codefendant Eaglin testified about his own conditions in prison, but said they did not affect his understanding of his rights. He had no personal knowledge of how Smith was treated. Smith did not testify in support of his claim that his statement was not voluntary.
The trial court denied the motion to suppress. Before the July 31 videotaped statement was played at trial, the court orally announced its reasoning for denying the motion. The court explained that it had reviewed all of the evidence and found that Smith was adequately informed of his constitutional rights, that Smith did not appear confused, and that there was no evidence that the statement was involuntary.
Smith contends that the trial court failed to make specific findings of fact, *524 including credibility determinations about each witness, and conclusions of law. Thus, he claims the order is insufficient for appellate review and violated his right of due process. We disagree. We find that the court's order adequately recites both its findings and conclusions. To the extent Smith claims the trial court made no findings or conclusions, he disregards the oral findings described above.
We now review the trial court's denial of Smith's motion.[8] On review, a trial court's ruling on motions to suppress is presumed correct. The evidence is considered in the light most favorable to the ruling, and mixed questions of fact and law are reviewed de novo. Schoenwetter v. State, 931 So.2d 857, 866 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 587, 166 L.Ed.2d 437 (2006). In this case, the trial court found no evidence that Smith's statement was involuntary. Smith did not testify at the evidentiary hearing. He never complained to Agent Uebelacker on any of the four occasions on which he was questioned. The agent never threatened or coerced Smith or made him any promises. Regardless of Smith's treatment at the prison by corrections officers, there was no evidence demonstrating these conditions affected his statement. We hold that the trial court did not err in denying Smith's motion.

C. Competent, Substantial Evidence
The jury found Smith guilty of first-degree murder under both theories charged: premeditated murder and felony murder based on the underlying felonies of escape and resisting an officer with violence. Smith argues that competent, substantial evidence does not support the verdict under either basis.[9]
We conclude that competent, substantial evidence supports Smith's conviction for first-degree premeditated murder. Ample evidence at trial demonstrated that from the inception of the escape plan, Smith stated that he planned to kill the guard supervising them. Smith even expressed a preference that a female officer be on duty and said he would "kill the bitch." Killing the guard was necessary to the plan to give the escapees time to construct the ladders. Smith admitted that during the escape attempt he employed a ruse to lure Officer Lathram to the mop closet where Eaglin stood nearby. With the officer distracted looking for the closet key, Smith stood aside while Eaglin stealthily approached and delivered the fatal sledgehammer blows. Although Smith did not hit Officer Lathram, he had the intent to kill. See Ferrell v. State, 686 So.2d 1324, 1329 (Fla.1996) (finding that, while the defendant may not have actually pulled the trigger, he played an integral part in the crimes and in actually luring the victim to his death, and therefore was guilty as a principal). Thus, competent, substantial evidence supports the conviction for premeditated murder.
Where, as in this case, the jury delivers a general verdict and one of the theories of first-degree murder conviction is supported by competent, substantial evidence, *525 we need not address the others. See Crain v. State, 894 So.2d 59, 73 (Fla. 2005) ("A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation."). Nevertheless, we address Smith's argument that the State failed to prove felony murder under either of the other theories alleged: (1) felony murder committed during an escape, and (2) felony murder committed while resisting an officer with violence.
First, Smith contends that the State did not prove that Smith was lawfully confined in a state correctional facility and thus did not establish the escape felony murder theory. In State v. Williams, 444 So.2d 13, 15 (Fla.1984), however, we held that the "presumption of lawful custody exists" when the State proves that a person is confined in a prison and that the "unlawfulness of the confinement is an affirmative defense to be raised by the defendant." In this case, there was ample evidence that at the time of the murder and escape Smith was a prisoner at CCI. Thus, competent, substantial evidence supports the verdict under this felony murder theory as well.
Second, Smith claims that he did not defy a direct command from Officer Lathram and thus did not resist an officer with violence. The relevant statute provides in pertinent part: "Whoever knowingly and willfully resists, obstructs, or opposes any officer ... in the lawful execution of any legal duty, by offering or doing violence to the person of such officer... is guilty of a felony of the third degree...." § 843.01, Fla. Stat. (2002). When Smith and his codefendants lured Officer Lathrem to the mop closet and killed her, she was performing her duty of supervising the inmates. Such evidence clearly meets the requirements of the statute. Therefore, Smith's first-degree murder conviction is supported by competent, substantial evidence under each of the alternative theories.

D. Inconsistent Positions
Smith next claims that the State violated his right to due process by taking inconsistent positions at his and codefendant Eaglin's trials about who masterminded the escape. We decline to review this claim for two reasons.
First, this claim was not preserved. Although Eaglin's trial occurred before Smith's, Smith did not raise this issue during either phase of his trial. Instead, Smith himself asserted it at his Spencer[10] hearing. After making his statement to relatives of the victims, Smith alleged that at Eaglin's trial the State argued Eaglin was the ringleader, but at Smith's trial contended it was Smith. Because this alleged inconsistency was not raised contemporaneously with the State's argument at trial, the issue is not preserved.
Second, Smith fails to demonstrate that the State actually pursued inconsistent theories. We have previously held that to bring relevant matters contained in separate records before the Court, the party must move to supplement the record and attach verified and complete copies of the material. Johnson v. State, 660 So.2d 648, 653 (Fla.1995). Because Eaglin's case is currently pending in this Court, appellate counsel attempted to incorporate by reference the entire record in Eaglin's case. Counsel has not identified any evidence in that record, however, that the State took inconsistent positions at the separate trials.[11] *526 Therefore, we cannot review this claim.
Finally, at least one federal appellate court has rejected a claim that asserting inconsistent positions in codefendants' prosecutions violates due process. Fotopoulos v. Secretary, Dep't of Corrections, 516 F.3d 1229, 1235 (11th Cir.2008) (reversing the district court's conclusion that the prosecutor's use of inconsistent theories at the separate trials about the defendant's domination of his codefendant violated due process); see also Bradshaw v. Stumpf, 545 U.S. 175, 190, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005) (Thomas, J., concurring) ("[The] Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.").

E. The Motion for Mistrial
Smith next argues that the trial court erred in denying his motion for mistrial when a witness violated an order forbidding mention to the jury that Smith previously faced a penalty phase in a different murder case. "A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." England v. State, 940 So.2d 389, 401-02 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1916, 167 L.Ed.2d 571 (2007). We review a trial court's ruling on a mistrial motion for abuse of discretion. Id. at 402. We reverse such a ruling "only when the error is deemed so prejudicial that it vitiates the entire trial." Floyd v. State, 913 So.2d 564, 576 (Fla.2005).
In this case, the trial court granted Smith's motion in limine to preclude testimony that Smith faced a penalty phase in his 1993 murder of an elderly woman during a burglary. During the penalty phase, the State presented evidence about that murder and sought to present, through the same witness, evidence of Smith's other 1993 convictions. As a segue, the following ensued.
PROSECUTOR: Now, in that trial, did you present evidence to another Broward County case involving the defendant, Stephen Smith? In other words, in you
WITNESS: Yes, sir. During the penalty phase, I did present
Defense counsel immediately moved for mistrial and, to avoid emphasizing the testimony, rejected the court's offer of a curative instruction. The circuit court denied the motion, finding the reference so fleeting that the jury was not likely even to remember it.
Smith relies on Hitchcock v. State, 673 So.2d 859 (Fla.1996), in which we advised:
When resentencing a defendant who has previously been sentenced to death, caution should be used in mentioning the defendant's prior sentence. Making the present jury aware that a prior jury recommended death and reemphasizing this fact ... could have the effect of preconditioning the present jury to a death recommendation.
Id. at 863. Our concerns in Hitchcock are not present here. Smith was subject to a penalty phase in a different case, bare mention of that fact was made in this penalty phase, Smith was sentenced to lifenot deathin that case, and the judgment *527 and sentence evidencing that fact were entered into evidence. Thus, although the order on the motion in limine was violated by the mention of the prior penalty proceeding, such testimony did not vitiate the entire penalty phase.

F. Weighing Factors and Proportionality
Smith next argues that the trial court abused its discretion in weighing the aggravating and mitigating factors, and also claims that the sentence is not proportionate. We address each claim in turn.
We review the weight the trial court ascribes to mitigating factors under the abuse of discretion standard. Walker v. State, 957 So.2d 560, 584 (Fla.2007). Further, competent, substantial evidence must support the trial court's final decision in weighing the aggravating circumstances and mitigation. Id. In this case, the trial court found the following mitigating factors and assigned the weight indicated: (1) Smith's background (great weight); (2) Smith's expression of remorse (little weight); and (3) mental and emotional health issues (some weight). Smith contends that the latter factor was entitled to more weight because these issues were intertwined with his background. However, with regard to the latter factor, the court found that Smith's history of depression, substance abuse, and attention deficit disorder was proven and may be related to his "dysfunctional family background." The court thus considered them in context with Smith's background to which it gave great weight. Smith has not demonstrated that the trial court abused its discretion in ascribing the mental health issues some weight.
Smith also contends that the court erred in its final weighing of the aggravators and mitigators. The court found the following aggravating circumstances: (1) Smith was under a sentence of imprisonment; (2) he had prior violent felony convictions, including first-degree murder, burglary, robbery, and sexual battery; (3) the murder in this case was committed for the purpose of escape from custody, and the victim was a law enforcement officer engaged in official duties (merged); and (4) the murder was cold, calculated, and premeditated (CCP). The trial court concluded "that the aggravating circumstances in this case greatly outweigh the mitigating circumstances present."
We reject Smith's contention that the mitigating evidence regarding his childhood alone outweighs all the aggravating factors, two of which are "among the more serious aggravating circumstances." Chamberlain v. State, 881 So.2d 1087, 1108-09 (Fla.2004) (noting that CCP and prior violent felony conviction are considered among the more serious aggravating circumstances). We also reject Smith's claim that he was merely a passive accomplice to the murder because he did not deliver the fatal blow. This minimization of Smith's role ignores the evidence that from the beginning murder was part of Smith's escape plan, and he played an active role by luring the officer to the mop closet where Eaglin waited with the sledgehammer. Therefore, we find that competent, substantial evidence supports the trial court's determination.
Smith raises three arguments regarding our proportionality review. First, he makes the conclusory claim that our review is legally insufficient and unconstitutional because it is does not include review of other factors, such as death cases from other states. We have previously rejected similar attacks on Florida's death penalty based on an American Bar Association report. See Rutherford v. State, 940 So.2d 1112, 1118 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 465, 166 L.Ed.2d 331 *528 (2006); accord Rolling v. State, 944 So.2d 176, 181 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 466, 166 L.Ed.2d 332 (2006).
Smith next claims that that his sentence is not proportionate because codefendant Jones, who Smith alleges had an equal role in the escape, received a life sentence. However, Jones pled guilty and received a life sentence. We have previously rejected claims of disparate sentencing when the codefendant's sentence resulted from his entry of a plea or prosecutorial discretion. England, 940 So.2d at 406 (citing cases). Therefore, we reject this claim as well.[12]
Finally, we address Smith's contention that his death sentence is not proportionate compared to death sentences in other Florida cases. In this case, the jury voted nine to three to recommend a sentence of death. As stated above, the trial court found four weighty aggravators and concluded that they greatly outweighed the mitigation. In conducting proportionality review, "we consider the totality of the circumstances of the case and compare the case with other capital cases." Simmons v. State, 934 So.2d 1100, 1122 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1334, 167 L.Ed.2d 80 (2007). We hold that the sentence in this case is comparable to other cases in which this Court has affirmed the death penalty and is therefore proportionate. See Caballero v. State, 851 So.2d 655, 664 (Fla. 2003) (affirming the death sentence where the defendant and the codefendant bound and robbed the victim in her home, then planned to and did murder her, and where the trial court found four aggravators CCP, committed in course of robbery or kidnapping, committed to avoid arrest, and heinous, atrocious and cruel); Franqui v. State, 804 So.2d 1185, 1198 (Fla.2001) (finding a sentence proportional where a codefendant killed a police officer in the course of a bank robbery that defendant planned and during which he was armed and where the trial court found three aggravatorsprior violent felony conviction, murder committed in the course of robbery, and murder was committed to avoid arrest and victim was a law enforcement officerand minimal mitigation); see also Van Poyck v. State, 564 So.2d 1066, 1070-71 (Fla.1990) (finding the death sentence proportional even though the defendant was not the triggerman but was the instigator and the primary participant in the crime and knew that lethal force could be used).

G. The Mitigation Instruction
Smith next argues that the trial court abused its discretion in denying his request for a special jury instruction. Smith requested a jury instruction regarding his list of nonstatutory mitigating factors. The trial court denied the request, noting that counsel could argue all the particulars supported by the evidence but that the court would give the standard "catch-all" instruction. We have consistently found no abuse of discretion in denying a request for such a special instruction. See Belcher v. State, 851 So.2d 678, 685 (Fla.2003); James v. State, 695 So.2d 1229, 1236 (Fla.1997). Therefore, we affirm the trial court's denial of Smith's request.

H. Constitutional Issues
Smith raises several constitutional challenges to Florida's lethal injection procedures and death penalty scheme, each of which we have previously rejected. We briefly summarize our precedent here. First, we have upheld the constitutionality *529 of lethal injection. Provenzano v. State, 761 So.2d 1097, 1099 (Fla.2000) (holding that execution by lethal injection does not amount to cruel or unusual punishment or both). We recently rejected the same constitutional challenges to Florida's lethal injection procedures that Smith now asserts. Lightbourne v. McCollum, 969 So.2d 326, 353 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008); Schwab v. State, 969 So.2d 318, 325 (Fla. 2007), cert. denied, 128 S.Ct. 2486 (2008).[13] Smith correctly acknowledges that in Diaz v. State, 945 So.2d 1136, 1143 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006), we rejected the contention that Florida's lethal injection statute violates the separation of powers doctrine. See art. II, § 3, Fla. Const.
Finally, Smith argues that Florida's death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In this case, two of the four aggravating circumstances were prior felony conviction and under sentence of imprisonment at the time of the murder. We have previously held that Florida's capital sentencing procedure does not violate Ring when the case includes the prior violent felony aggravator. See Floyd, 913 So.2d at 577. We also have held that the aggravator of murder committed while under sentence of imprisonment may be found by the judge alone. Id. at 577-78; see Allen v. State, 854 So.2d 1255, 1262 (Fla.2003). Therefore, we reject this claim as well.

I. Instruction on Sentencing
Smith contends that a curative instruction the trial court gave misadvised the jury about its role in sentencing, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). During his closing argument in the penalty phase, defense counsel noted that the State knew about all of Smith's prior convictions and "[n]ow [the State] tells you today you gotta kill this poor man because he's got a prior record." The State objected that the argument was improper because defense counsel was "trying to transfer the ultimate sentencing to [the] jury." The court sustained the objection and, upon the State's request, gave a curative instruction:
COURT: Members of the jury, I will instruct you that none of these arguments are intended to make you feel like you're the instrument of death in the event that is the ultimate sentence in this case. Your job is to listen to, weigh the evidence, listen to these arguments, apply the law to the facts as you find them, and make a verdict, a recommendation to this Court, which is the ultimate sentencer. And I will give your recommendation great weight. All right.
Smith argues that this instruction "affirmatively misadvised the jury that its recommendation did not matter." We disagree. The curative instruction is consistent with the standard jury instruction, which was given at the close of the evidence in the penalty phase. See Fla. Std. Jury Instr. (Crim.) 7.11. (Penalty ProceedingCapital Cases).[14] As Smith acknowledges, *530 we have consistently rejected challenges to the standard instruction, holding that it correctly advises the jury of its role and does not unconstitutionally denigrate it. See Taylor v. State, 937 So.2d 590, 600 (Fla.2006). Therefore, we find no error in the trial court's curative instruction.

J. Cumulative Error
Smith finally claims that as a result of cumulative error, he was denied a fair trial. Because we have found no individual error, no cumulative error can exist. See Parker v. State, 904 So.2d 370, 380 (Fla. 2005) (noting that where the individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error necessarily fails); Johnson v. Singletary, 695 So.2d 263, 267 (Fla.1996).

III. CONCLUSION
Based on the analysis above, we affirm Smith's convictions and his sentence of death.
It is so ordered.
QUINCE, C.J., WELLS, PARIENTE, LEWIS, and BELL, JJ., and CANTERO, Senior Justice, concur.
ANSTEAD, J., dissents with an opinion.
ANSTEAD, J., dissenting.
Because I find both the written and oral presentations of counsel for the appellant fundamentally lacking, I would strike the appellate briefs, discharge counsel, and direct the trial court to appoint new appellate counsel for the appellant. Capital cases represent the most serious category of cases reviewed by this Court and such cases require diligent and competent advocacy by counsel. While this Court has inherent responsibility to assure such representation, the Florida Legislature has explicitly called upon the courts to take responsibility for assuring such representation in capital litigation. We should honor that call here.[15]
By coincidence, the Clerk of this Court scheduled oral argument in this case and the case of Hunter v. State, ___ So.2d ___, No. SC06-1963, 2008 WL 4352655 (Fla. Sept. 25, 2008), for the same date. In examining the briefs for appellants in those two cases, I was struck by both the similarity in approach and the facially flawed advocacy contained in the briefs in both cases. The oral advocacy was similarly lacking in both cases. Of course, the appellants are represented by the same counsel in both cases, and I have come to the same conclusion in Hunter as I have here.
NOTES
[1] The three prisoners also were indicted for the first-degree murder of another inmate, Charles Fuston. The State entered a nolle prosequi on that count as to Smith.
[2] Also in the penalty phase, the medical examiner testified that Officer Lathram had no defensive wounds, consistent with having no awareness of the attack, and that she was unconscious upon the sledgehammer's impact. Three victim impact witnesses also read statements.
[3] Smith's brother testified by video deposition from a Rhode Island prison where he is serving a life sentence for murdering and raping his stepdaughter. The evidence at the penalty phase showed, however, that all of Smith's sisters are married, employed, and living productive lives.
[4] The trial court rejected Smith's antisocial personality disorder as a mitigator.
[5] Smith alleges that trial counsel provided ineffective assistance by (1) failing to preserve for review the trial court's denial of his motion to suppress; (2) failing to object to testimony that Smith planned to rape any female guard supervising him during the escape; (3) failing to move for judgment of acquittal on the ground that the murder was the independent act of codefendant Eaglin; (4) failing to raise a second challenge to the constitutionality of Florida's lethal injection procedures; and (5) failing to challenge the constitutionality of Florida's clemency process.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] Smith gave statements to the agent on June 12, June 23, July 27, and July 31, 2003. Only his last statement was admitted at trial.
[8] This issue was preserved for review with the denial of the motion; trial counsel was not required to object at the time the evidence was admitted at trial. See § 90.104(1)(b), Fla. Stat. (2003); In re Amendments to The Florida Evidence CodeSection 90.104, 914 So.2d 940, 941 (Fla.2005).
[9] Even if Smith had not raised the issue, in death penalty appeals this Court must independently review the record to confirm that the verdict is supported by competent, substantial evidence. See Fla. R.App. P. 9.142(a)(6); see also Floyd v. State, 913 So.2d 564, 572 n. 2 (Fla.2005) (recognizing the Court's independent duty).
[10] Spencer v. State, 615 So.2d 688 (Fla. 1993).
[11] Eaglin v. State, No. SC06-760 (Fla. notice of appeal filed April 21, 2006), is currently pending in the Court. At oral argument, Smith's counsel admitted that he has not reviewed the codefendant's record to ascertain whether any evidence supports this claim. We have denied a motion, filed after oral argument, formally requesting the Court take judicial notice of the other record and asking permission to provide the necessary record citations and argument.
[12] We note that codefendant Eaglin was sentenced to death.
[13] The United States Supreme Court denied certiorari review in these cases following release of Baze v. Rees, ___ U.S. ___, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), in which a majority of the Court upheld the constitutionality of Kentucky's lethal injection protocol against an Eighth Amendment challenge.
[14] The standard instruction provides as follows in pertinent part:

Ladies and gentlemen of the jury, it is now your duty to advise the court as to what punishment should be imposed upon the defendant for [his] [her] crime of Murder in the First Degree. As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the judge; however, it is your duty to follow the law that will now be given you by the court and render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.
Your advisory sentence should be based upon the evidence [that you have heard while trying the guilt or innocence of the defendant and evidence that has been presented to you in these proceedings] [that has been presented to you in these proceedings].
[15] I acknowledge that the Court, to its credit, has notified both the Florida Bar and the Executive Director of the Legislature's Commission on Capital Cases of concerns about the performance of counsel in the Smith and Hunter cases as well as other filings by counsel in this Court.