[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13993

_____

D.C. Docket No. 4:12-cv-00250-RV-CAS

KEVIN J. SULLIVAN,

Petitioner - Appellee,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 20, 2016)

Before MARCUS and WILLIAM PRYOR, Circuit Judges, and DAVIS,[*] District
Judge.

_____

[*] Honorable Brian J. Davis, United States District Judge for the Middle District of
Florida, sitting by designation.

MARCUS, Circuit Judge:

The Secretary of the Florida Department of Corrections ("Secretary") appeals the district court's grant of federal habeas corpus relief to petitioner Kevin Sullivan based on Sullivan's claim that he received ineffective assistance of counsel when his trial attorney advised him to turn down the State's plea offer and proceed to trial based on a fundamental misunderstanding of the relevant state law. After thorough review, and with the benefit of oral argument, we conclude that the petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment and, therefore, affirm.

## I.

## A.

On July 26, 2003, the State of Florida filed a traffic citation that was subsequently amended by Information in the Circuit Court for Bay County, charging Kevin Sullivan with: fleeing and attempting to elude a law enforcement officer, Fla Stat. § 316.1935(3); possession of cocaine, Fla. Stat. § 893.13; and possession of drug paraphernalia, Fla. Stat. § 893.147. The case proceeded to a one-day jury trial on May 4, 2005, at which Sullivan was represented by Charles Bennett Bollinger, III, Esq.

The State presented evidence that, on July 26, 2003, Sullivan led several deputy sheriffs on an extended car chase during which he ran red lights and stop

2

signs, drove into oncoming traffic, and nearly struck pedestrians. Eventually, Sullivan crashed into a curb and the deputies boxed in his car. Sullivan opened his door to throw something out, at which time an officer was able to grab him. With the help of several other officers, Sullivan was finally subdued. The deputies brought him to the jail for booking, which refused to accept him because he appeared intoxicated or impaired. Sullivan was taken to the hospital, where he said that he had been using cocaine. Deputies found cocaine in Sullivan's car, and the item he had thrown out during the chase was discovered to be a crack pipe. To one witness, Sullivan appeared "crazy," not "in the right state of mind," and "strung out on drugs." Two of the arresting officers thought that Sullivan seemed mentally deranged.

During the charge conference at the end of the trial, the prosecutor asked for a jury instruction that voluntary intoxication is not a defense. Indeed, a Florida statute passed in 1999, four years before Sullivan's crime and nearly six before his trial, provides exactly that. See Fla. Stat. § 775.051 ("Voluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law."). Defense counsel Bollinger denied that he was attempting to present a voluntary intoxication defense, and agreed with the prosecutor that the standard jury instructions provided that voluntary intoxication is not a defense.

Instead, Bollinger sought a jury instruction regarding an insanity defense based on the testimony that Sullivan was not in his right mind. However, the trial court said that Sullivan had not given the State notice that he would be asserting an insanity defense, as required by state law, see Fla. R. Crim. P. 3.216(b), and that if he wanted to raise that defense, he would have to move for a mistrial.

After Bollinger and Sullivan conferred, Sullivan waived his right to move for a mistrial and consented to moving forward without presenting an insanity defense. In closing argument, Bollinger conceded that Sullivan was guilty of the possession charges and argued that Sullivan's actions in fleeing from the police were not willful, intentional, or knowing because the evidence showed that Sullivan was mentally deranged during and after his flight.

The trial court instructed the jury that neither voluntary intoxication nor insanity is a defense to any of the offenses leveled against Sullivan. The jury found Sullivan guilty as charged. On July 15, 2005, the trial court sentenced Sullivan as an Habitual Felony Offender to thirty years in prison on the fleeing charge, and to concurrent sentences of five years and time served on the cocaine and drug paraphernalia charges, respectively.

**B.**

Sullivan retained the Harper & Harper Law Firm (the "Harper Firm") and Robert Harper, III, Esq. ("Harper"), to represent him on direct appeal and in his

4

state post-conviction attack.  On August 31, 2006, Sullivan's conviction was affirmed on direct appeal.  Sullivan v. State, 937 So. 2d 128 (Fla. Dist. Ct. App. 2006) (table).  No ineffective assistance of counsel claim was raised on direct appeal because Florida requires that ineffective assistance claims generally be raised on collateral review pursuant to Florida Rule of Criminal Procedure 3.850. Smith v. State, 998 So. 2d 516, 522 (Fla. 2008), as revised on denial of reh'g (Dec. 18, 2008).

In order to assist Harper in preparing his post-conviction motion pursuant to Rule 3.850, Sullivan sent many letters to the Harper Firm and Harper.  Of particular relevance to this appeal, Sullivan's letters repeatedly suggested that Harper consider raising a Sixth Amendment ineffective assistance of counsel claim, specifically alleging that trial counsel provided ineffective assistance by attempting to present a voluntary intoxication defense, even though voluntary intoxication had been abolished as a defense four years before Sullivan was arrested.  Thus, for example, on June 17, 2007, Sullivan wrote to Harper that, after trial, Bollinger had encouraged Sullivan to file an ineffective assistance claim arguing that "[h]is trial strategy could be turned around to prove ineffectual." Again, around six weeks later, Sullivan again wrote to Harper to express his opinion that Harper's proposed claims were not very strong and asking him to

explore other claims, including Bollinger's "attempting to present a voluntary intoxication defense through the back door."

On September 22, 2007, Sullivan wrote that Bollinger's statement to the trial court during the charge conference that voluntary intoxication was not his intended defense was untrue. In fact, during pretrial conversations, Bollinger told Sullivan that voluntary intoxication was his intended defense, but that he would present it through a "back-door" approach, which meant that he would not request a voluntary intoxication instruction from the trial court and would instead encourage the jury to "infer" that Sullivan could not have informed the requisite intent to be convicted of fleeing because he was high on cocaine. Sullivan explained that Bollinger "got caught at this ridiculous attempt at a legally impermissible defense by the State, and therefore had to state on the record to the Court, in an attempt to avoid the devastating limiting instruction for voluntary intoxication, that this was not his intended defense." In a May 10, 2008 letter, Sullivan again explained that, prior to trial, Bollinger had "informed [Sullivan] that he would be pursuing a 'Back-Door' voluntary intoxication defense, even though it was no longer a legally recognized defense."

On July 11, 2008, Harper wrote back to Sullivan to explain why he did not think they should pursue an ineffective assistance of counsel claim challenging counsel's decision to pursue voluntary intoxication, which was a "non-existent

6

defense." Harper wrote that raising that claim would effectively require them to admit that there was no defense to Sullivan's case, thereby "shooting [them]selves in the foot" because they would be unable "to prove prejudice as required by Strickland[ v. Washington, 466 U.S. 668 (1984)]." Instead, Harper explained, they would argue that Bollinger had failed to provide any meaningful adversary testing of the prosecution's case at all and, therefore, that his representation amounted to structural error under United States v. Cronic, 466 U.S. 648 (1984). Finally, in a July 28, 2008 letter, Sullivan thanked Harper for his hard work on the Rule 3.850 motion, but again expressed concern that the motion did not challenge Bollinger's decision to raise a voluntary intoxication defense.

Harper filed an original Rule 3.850 motion in the Circuit Court for Bay County on August 15, 2008, and then filed an amended motion on September 11, 2008, raising four claims of ineffective assistance of counsel: (1) trial counsel was ineffective for failing to subject the prosecution's case to any meaningful adversarial testing under Cronic because counsel conceded guilt on two counts and failed to raise an insanity defense; (2) trial counsel was ineffective for failing to call Sullivan as a witness; (3) trial counsel was ineffective for failing to present mitigating evidence during the "penalty phase"; and (4) trial counsel was ineffective for waiving the affirmative defense of insanity without Sullivan's consent.

7

The Harper firm then withdrew from the case, and the amended motion proceeded to an evidentiary hearing at which Sullivan was represented by Michael Ufferman, Esq., his current federal habeas counsel.  At the evidentiary hearing, Sullivan testified and called witnesses, including his trial counsel Bollinger. Bollinger admitted that, prior to Sullivan's trial, he was unaware that voluntary intoxication had been abolished as a defense.  Sullivan then filed a post-hearing memorandum, arguing for the first time that trial counsel was ineffective for raising a voluntary intoxication defense.

The state trial court denied Sullivan's amended Rule 3.850 motion on December 2, 2010.  As relevant to the present appeal, the trial court found that Sullivan had not timely raised an ineffective assistance of counsel claim challenging Bollinger's use of the voluntary intoxication defense.  Sullivan's Rule 3.850 motions made no mention of the claim, and he did not raise it until after the evidentiary hearing.  Therefore, the court refused to consider that issue because it was "not timely raised under Rule 3.850(b)."  The trial court's denial was summarily affirmed.  Sullivan v. State, 93 So.3d 1019 (Fla. Dist. Ct. App. 2012) (table).

Sullivan filed a second Rule 3.850 motion through attorney Ufferman on May 16, 2012, alleging that Bollinger's testimony at the August 27, 2010 evidentiary hearing -- that voluntary intoxication was the theory of defense at trial

8

– constituted newly discovered evidence.  He further alleged that the State had offered him a ten-year plea agreement prior to trial and that, had he known that voluntary intoxication was not a viable defense, he would have accepted the plea agreement.  The state trial court found that the claim was not based on newly discovered evidence and was, therefore, untimely.  That decision, too, was summarily affirmed on April 5, 2013.

## C.

Meanwhile, on May 17, 2012, while his second Rule 3.850 motion was pending in state court, Sullivan filed his initial petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida, pursuant to 28 U.S.C. § 2254.  Sullivan amended his federal habeas petition twice.  His second amended petition asserted five claims for relief, only one of which is relevant to this appeal: trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment by defending his case based on the legally impermissible defense of voluntary intoxication instead of advising him to accept the State's pretrial plea offer (the "IAC-trial claim").[2]

---

[2] Sullivan's remaining four claims were that trial counsel provided ineffective assistance by (1) failing to investigate Sullivan's mental health issues before trial, (2) improperly advising Sullivan to waive the trial court's mistrial option, and (3) effectively failing to present any defense to the jury, and (4) that the state trial court erred by denying Sullivan's motion to recuse, which was based on an alleged ex-parte communication between the trial judge and the prosecutor.

The Secretary argued that the ineffective-assistance-of-counsel claim was procedurally defaulted because Sullivan had failed to raise it in a timely manner in state court. A federal habeas court cannot reach the merits of a claim that was procedurally defaulted in state court unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). Sullivan conceded that the IAC-trial claim was procedurally defaulted, but argued that the district court should excuse his procedural default under Martinez v. Ryan, 132 S. Ct. 1309 (2012), because post-conviction counsel had provided ineffective assistance by failing to raise the underlying IAC-trial claim in his original Rule 3.850 motion. Under Martinez, post-conviction counsel's failure to raise a claim in a state collateral proceeding can provide cause and prejudice to excuse a procedural default if: the procedural default is caused by post-conviction counsel's unconstitutionally ineffective assistance; the collateral proceeding in which post-conviction counsel erred was the first opportunity the defendant had to raise the procedurally defaulted claim; and the procedurally defaulted claim has at least "some merit." See id. at 1318.

The case was referred to a magistrate judge, who held an evidentiary hearing to address whether post-conviction counsel was ineffective for failing to raise the

10

IAC-trial claim and whether the ineffectiveness of counsel claim was meritorious. Bollinger, Brian Kelley (the trial prosecutor), Harper, and Sullivan testified.

Bollinger testified that, before Sullivan's trial, the prosecutor had extended a plea offer of eleven years in prison. In his many years of practicing before the trial judge in this case, Judge Don Sirmons, Bollinger had never seen him reject a plea deal to which both parties agreed. Bollinger said that, prior to trial in this case, he told Sullivan that he intended to defend his case using a voluntary intoxication defense, and that, at the time he conveyed the plea offer to Sullivan, he was not aware that voluntary intoxication had been abolished as a defense in Florida. In fact, Bollinger testified that, at the time he conveyed the plea offer to Sullivan, he told Sullivan that they had a "very good chance" of winning the case at trial based on the voluntary intoxication defense. Therefore, in spite of the State's intent to seek an enhanced habitual offender sentence, Bollinger advised Sullivan to reject the prosecution's plea offer and proceed to trial. Bollinger, who had previously represented Sullivan in another trial that resulted in a jury verdict of acquittal, testified that Sullivan always followed his advice and recommendations. However, had he known prior to trial that voluntary intoxication was not an authorized defense, Bollinger said that he would have advised Sullivan to accept the plea offer because he faced thirty years if convicted at trial.

11

The trial prosecutor, Mr. Kelley, testified that he, and the previous prosecutor who had been working on Sullivan's case before him, had extended Sullivan plea offers, which ranged from twenty years down to twelve or thirteen years. He agreed with Bollinger that Judge Sirmons most likely would have accepted a twelve- or thirteen-year sentence pursuant to a plea.

Post-conviction counsel Harper testified that he had decided against raising the IAC-trial claim, challenging trial counsel's decision to employ a voluntary intoxication defense, for two reasons. First, he said, he would not have been able to establish the prejudice element of that claim because, during the time that he represented Sullivan, he was not aware that the prosecution had extended a pretrial plea offer to Sullivan and Sullivan had not mentioned any plea offer. He relied on Sullivan to explain why he had gone to trial, and because Sullivan did not mention any plea offers, the plea offer made by the State "was never on [his] radar." In preparing Sullivan's appeal and Rule 3.850 motion, Harper never spoke to Bollinger -- in fact, he consciously chose not to contact trial counsel to speak about the case because he "didn't want to hear the BS."

Second, Harper explained, he felt that he would be violating his ethical obligations if he raised the IAC-trial claim because doing so would have required him to "lie" and say that there had been a pretrial plea offer -- when he had no knowledge of one -- or that Sullivan and Bollinger had been unaware that

12

voluntary intoxication was not a legitimate defense.  He thought that Sullivan and his attorney had known before trial that the voluntary intoxication defense had been abolished, but had raised that defense anyway because Sullivan had been "caught red-handed" and the State did not want to extend a plea offer to Sullivan. Harper stated that he "100 percent, no question" believed that Sullivan knew before trial that voluntary intoxication was not a valid defense, and he did not want to "trick" himself into believing that Sullivan had not known.  He acknowledged, however, that he could not recall any conversation in which Sullivan said that he knew, pretrial, that the defense of voluntary intoxication had been abolished; he also admitted that he did not talk to anyone else (including trial counsel) to verify or confirm his suspicion.  In fact, when asked whether he took "any steps whatsoever to see if there was any basis for [his] ethical concerns," he said that he simply decided not to raise the IAC-trial claim.

Finally, Sullivan testified that, a few days before trial, Bollinger visited him in jail and told him that the prosecution had extended a ten-year plea offer. Bollinger also advised him that he would be pursuing a voluntary intoxication defense at trial.  Sullivan said that he was aware the State would seek an Habitual Offender sentence, meaning that he was facing thirty years in prison if convicted of fleeing at trial.  On the morning of trial, he said, Bollinger was "very confident" in

the voluntary intoxication defense and advised him to "proceed to trial and to turn down the plea offer."

Sullivan testified that he always followed Bollinger's advice, and did so here. He said that, prior to trial, he was not aware that voluntary intoxication had been abolished as a defense, and he only learned that it had been abolished when the prosecutor asked for an instruction informing the jury that voluntary intoxication was not a valid defense. Sullivan stated that, had he known prior to trial that voluntary intoxication was not a valid defense, he would have accepted the prosecution's pretrial plea offer -- even if it was, as the prosecutor had testified, for twelve years in prison. He added that he had never discussed the pretrial plea offer with Harper because he did not know it was relevant and Harper did not ask him about any plea.

On June 15, 2015, the magistrate judge issued a Report and Recommendation finding that post-conviction counsel had been ineffective for failing to raise Sullivan's IAC-trial claim and, moreover, that the IAC-trial claim was meritorious. Regarding the ineffective assistance of post-conviction counsel, the magistrate judge found as a fact that Harper did not know that the State had extended a plea offer to Sullivan, and explained that Harper could have reasonably decided not to raise the IAC-trial claim if, in fact, the State had not made any plea offer to Sullivan. However, in light of the undisputed testimony that a plea offer

14

had been made, the "critical inquiry" was whether Harper's investigation of the existence of a plea offer was objectively reasonable under Strickland v. Washington, 466 U.S. 668 (1984).

Based on the evidence presented at the hearing, the magistrate judge found as fact that "Harper did not take any additional steps [beyond speaking to Sullivan] to investigate the existence of the plea offer." Harper didn't ask Sullivan about a plea directly, nor did he contact trial counsel or the prosecutor to investigate. Moreover, the magistrate judge found as fact that Harper never took any steps to verify his ethical concerns that Sullivan or Bollinger would lie to him about whether they knew the voluntary intoxication defense had been abolished before trial. The magistrate judge determined that it was "not reasonable, without more than a feeling, to assume that Bollinger would lie without at least contacting him and exploring the issue." Ultimately, the magistrate judge concluded that post-conviction counsel's failure to investigate the existence of a plea offer fell below Strickland's objective standard of reasonableness and, furthermore, that the failure to investigate had prejudiced Sullivan because there was a reasonable probability that the state courts would have granted post-conviction relief had the plea been discovered and the IAC-trial claim raised. Accordingly, Sullivan had shown cause and prejudice to excuse the procedural default of the IAC-trial claim. See Martinez, 132 S. Ct. at 1318.

15

Turning to the merits of the ineffective assistance of trial counsel claim, the magistrate judge found credible Sullivan's and Bollinger's testimony that they were unaware the voluntary intoxication defense had been abolished prior to trial. The magistrate judge determined that Bollinger had rendered ineffective assistance by proceeding to trial based on a defense that had been abolished five years earlier. Moreover, the magistrate judge explained, Bollinger's failure to know the law had changed meant that he failed to understand the importance of the plea negotiations and, therefore, unreasonably advised Sullivan to reject the state's twelve-year plea offer. The magistrate judge held that Sullivan was prejudiced by this deficiency because Bollinger's erroneous advice caused him to reject the pretrial plea offer, concede guilt on the possession charges, and, ultimately, be sentenced to thirty years in prison, instead of the twelve years in prison he would have received had he accepted the plea.[3] Accordingly, the magistrate judge determined that Sullivan was entitled to habeas relief on the IAC-trial claim. The magistrate judge rejected Sullivan's remaining claims for relief.

The district court adopted the magistrate judge's Report and Recommendation over the objection of the Secretary, and ordered the Secretary to "re-offer the [twelve-year] pretrial plea agreement to Petitioner . . . within NINETY (90) DAYS from the date of this order. If petitioner accepts the offer, it

---

[3] The magistrate judge found that the State's final plea offer had been twelve years in prison.

16

will be left to the state trial court to exercise its discretion in making a determination with regard to Petitioner's convictions and an appropriate sentence, taking into account all of the circumstances in the case."  The Secretary timely appealed.

## II.

Of the many determinations made by the magistrate judge and adopted by the district court, the Secretary challenges only one: whether post-conviction counsel's investigation into the existence of a pretrial plea offer was objectively unreasonable under Strickland.  When reviewing the grant of a § 2254 petition, we review questions of law and mixed questions of law and fact, including ineffective assistance of counsel claims, de novo, and review findings of fact for clear error. Bellizia v. Fla. Dep't of Corr., 614 F.3d 1326, 1328–29 (11th Cir. 2010).

In order to establish that post-conviction counsel's failure to raise the IAC-trial claim constituted unconstitutionally ineffective assistance under the Sixth Amendment, Sullivan was required to show that (1) his counsel's performance was deficient and "fell below an objective standard of reasonableness," and (2) the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In this appeal, we need only address the deficient performance prong of Strickland, which requires us to determine "whether, in light

of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690.[4]

"Among the duties owed by minimally competent counsel is the duty to make reasonable investigations or to make a reasonable decision that makes said investigations unnecessary." Blankenship v. Hall, 542 F.3d 1253, 1273 (11th Cir. 2008). As the Supreme Court has explained:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91. Moreover, we "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527 (2003). Counsel's investigation does not fall below Strickland's standard so long as "a reasonable lawyer could have decided, under the circumstances, not to investigate . . . particular evidence." Payne v. Allen, 539 F.3d 1297, 1316 (11th Cir. 2008) (quotation omitted).

---

[4] The Secretary does not challenge the magistrate judge's conclusion that, if post-conviction counsel's investigation had been constitutionally deficient, then Sullivan sustained prejudice.

As we see it, post-conviction counsel's failure to take any step to investigate the IAC-trial claim was objectively unreasonable in light of the information that Sullivan had provided him and, indeed, based on even the most cursory review of the trial record. For starters, there were obvious red flags running through Harper's correspondence with Sullivan. Sullivan repeatedly told Harper that trial counsel had presented a defense that was not cognizable under Florida law. Moreover, simply by looking at the trial record, Harper could not have helped but be fully aware that trial counsel had defended Sullivan's case based on a theory that had been abolished by the Florida legislature nearly six years before Sullivan's trial. See Fla. Stat. § 775.051 (effective Oct. 1, 1999). Indeed, having been legally barred from presenting a voluntary intoxication defense or an insanity defense, trial counsel was left with virtually nothing to argue to the jury.

It is also abundantly clear that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014). Trial counsel's presentation of a voluntary intoxication defense long after it had been statutorily abolished clearly indicated a potentially meritorious ineffective assistance of counsel claim and screamed out for further inquiry. Instead, post-conviction counsel did nothing to investigate this potential claim, apart from reading

19

Sullivan's letters and speaking with Sullivan, primarily because he did not know the State had extended a pretrial plea offer and, therefore, thought that he would not be able to show that Sullivan was prejudiced by counsel's presentation of an illegal defense.

But Harper was plainly aware of information that would have led any reasonable attorney to inquire further about why Sullivan went to trial and why counsel presented a voluntary intoxication defense. See Wiggins, 539 U.S. at 527. Nearly two years elapsed between Sullivan's arrest and his trial, which suggests that there may have been some attempt to resolve the case without a trial. Indeed, the trial prosecutor's testimony at the evidentiary hearing confirmed that there were multiple rounds of plea negotiations prior to trial. As Harper himself explained at the federal evidentiary hearing, a plea agreement is "the easiest, most obvious source to determine whether someone's decision to go to trial was right or wrong." Knowing what post-conviction counsel knew, any reasonable attorney would have made at least some minimal exploration of the IAC-trial claim, such as asking Sullivan directly whether he had received a plea offer, requesting the state attorney's file or contacting the prosecutor to see whether a plea offer had been made, or, most importantly, speaking with trial counsel to ask why he had attempted to present a non-existent defense when his client was facing thirty years in prison. And any of these minimal steps would ultimately have uncovered the

20

existence of the plea agreement and undoubtedly would have supported a finding of prejudice on account of trial counsel's ineffective performance. Post-conviction counsel's failure to take even one of these obvious and easily accomplished investigatory steps "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

The Secretary argues, nevertheless, that post-conviction counsel reasonably limited his investigation of this case to communications with Sullivan. The Secretary says that, based on what Sullivan had told him, Harper reasonably believed that both Sullivan and trial counsel knew that the voluntary intoxication defense had been eliminated but chose to present it anyway because the State had refused to extend any plea offer so Sullivan had no option other than going to trial. As Harper put it at the federal evidentiary hearing, he thought that by raising the ineffectiveness claim regarding voluntary intoxication, he would have "to lie" and say that there had been a pretrial plea offer "that never happened" or that the presentation of the voluntary intoxication defense was unreasonable even though it was "the only thing, in [Harper's] opinion, that they had a chance to convince the jury." He explained that he had "sized the case up" and thought that Sullivan and trial counsel "knew that they had some real problems with their case, and the only way to get out of this problem is to get in front of a jury and make it confusing" by presenting a voluntary intoxication defense. Therefore, the Secretary suggests,

21

Harper reasonably believed that it would have been unethical to assert an ineffective assistance claim alleging that trial counsel did not know the voluntary intoxication defense had been abolished and that Sullivan had been prejudiced by the defense.  We remain unpersuaded.

Harper's ethical concerns in no way relieved him of his obligation to investigate this ineffective assistance claim.  While one vague statement in one of Sullivan's many letters could be read to suggest that he and trial counsel had known before trial that the voluntary intoxication defense had been eliminated,[5] any reasonable attorney still would have inquired further.  The essential question was whether trial counsel's performance fell "outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  And to answer that question, Harper had to determine what trial counsel knew and why he chose to present the defense he presented.  Even if trial counsel knew that voluntary intoxication was not a legally cognizable defense, Harper should have investigated to determine whether trial counsel's decision to present that defense was reasonable "in light of all the circumstances."  Id.

Moreover, for the reasons we've already explained, the fact that Sullivan didn't mention any plea offer from the State in his letters to Harper didn't absolve

---

[5] In a May 10, 2008 letter, Sullivan wrote that, prior to trial, trial counsel told him that "he would be pursuing a 'Back-Door' voluntary intoxication defense, even though it was no longer a legally recognized defense."

Harper of his duty to independently investigate that issue.  There were clear indications in the trial record that would have led a reasonable attorney to inquire further whether there had been a pretrial plea offer.  And it is counsel's duty, not the defendant's, to develop the relevant facts and to draw the defendant's focus to the information that might be potentially relevant, as defendants who are not versed in the law will often not know what facts are relevant to a given legal claim.  Indeed, Sullivan testified that he did not know that the existence of a plea agreement was important information, he was never asked, and he therefore did not mention it to Harper -- and the magistrate judge credited his testimony.  Again, Harper's failure to take any step to solicit or uncover critical information concerning Sullivan's decision to go to trial was objectively unreasonable.

The Secretary also argues that Harper reasonably relied on questioning tactics that had worked for him in the past in eliciting the existence of a plea agreement.  As Harper explained at the evidentiary hearing, in past cases clients had "almost invariably" told him about their pretrial plea offers without being directly asked.  However, counsel's obligation to conduct a reasonable investigation is not amenable to this type of one-size-fits-all approach.  Even though counsel's open-ended question may generally have worked to elicit the existence of a plea agreement from other clients, it does not mean that it is always sufficient to do so -- and plainly, it was not in this case.  Indeed, Harper admitted

23

that he doesn't always rely exclusively on the client for information, and will sometimes speak to trial counsel.  And if he had simply asked trial counsel Bollinger anything about the strategies surrounding the defense, he would almost surely have learned that a plea offer had been tendered by the prosecution.  The long and short of it is, in the peculiar circumstances of this case, with all of the red flags that we've detailed, any reasonable attorney would have done more to investigate why Sullivan went to trial literally without a coherent defense.

The petitioner has established that he received ineffective assistance of counsel in violation of the Sixth Amendment and, therefore, we affirm the judgment of the district court.

**AFFIRMED.**